**Andrew Wilson**, OSB # 125006
law.wilson12@gmail.com
**Lee Ferguson P.C.**
1204 W. Main St.
Medford, OR 97501
541-772-6462
Fax: 1-541-306-4516

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON MEDFORD DIVISION

Case No: 1:13-cv-01882-CL

REGINA MCDONALD,

    Plaintiff,

vs.

CARE CENTER (LINDA VISTA) INC.

    Defendant.

RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

| | | |
|---|---|---:|
| I. | INTRODUCTION | 4 |
| II | CONCESSIONS | 4 |
| III. | FACTS RELEVANT TO THIS SUMMARY JUDGMENT MOTION | 4 |
| | A.   Background information | 4 |
| | B.   Fall That Lead to Termination | 5 |
| | C.   Investigation of Plaintiff's Nursing Practices | 6 |
| |     1.   Failure to administer scheduled medications to residents and failure to properly account for medication. | 7 |
| |         i.   Documentation Errors | 8 |
| |         ii.   Medication Errors | 9 |

| | | | |
|---|---|---|---|
| | 2. | Improperly Altering Medication Records. | 11 |
| | 3. | Failure to timely and properly note doctor-prescribed medication changes | 11 |
| | 4. | Discontinuing medication without a doctor's order. | 12 |
| | 5. | Changing medication administration times, contrary to doctor's orders. | 13 |
| | 6. | Adversarial relationship with other staff | 13 |
| D. | | One final issue with defendant's factual assertions | 14 |
| IV. LEGAL ANALYSIS | | | 14 |
| A. | | Summary Judgment Standards | 14 |
| B. | | Disability discrimination claim under the ADA | 15 |
| | 1. | Plaintiff was actually disabled or perceived as such | 16 |
| | 2. | Defendant's non-discriminatory reasons for termination are pretext for discrimination. | 18 |
| C. | | Intentional Infliction of Emotional Distress | 19 |
| V. CONCLUSION | | | 20 |

**TABLE OF AUTHORITIES**

<u>Cases</u>

| | |
|---|---|
| *Adickes v. S.H. Kress & Co.*, 398 US 144, 160–61 (1970); | 15 |
| *British Motor Car Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund*, 882 F2d 371, 374 (9th Cir 1989) | 15 |
| *Celotex Corp v. Catrett, Inc.*, 477 US 317, 322-23 (1986). | 14,15 |
| *Hall v. May Dept. Stores Co.*, 292 Or 131, 135 (1981)). | 19 |
| *Harris v. Pameco Corp.*, 170 Or App 164, 172 (2000). | 19 |

*High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F2d 563, 574 (9th Cir 1990). ............................................................................................. 15

*Leisek v. Brightwood Corp.*, 278 F3d 895, 898 (9th Cir 2002) ............................ 15

*MacCrone v. Edwards Center, Inc.*, 160 Or App 91, 100 (1999). ........................ 19

*Nunes v. Wal–Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir.1999). ................. 16

*Patton v. J.C. Penney Co., Inc.*, 301 Or 117, 122 (1986) ...................................... 19

*Pottenger v. Potlatch Corp.*, 329 F3d 740, 746 (9th Cir 2003). ............................ 15

*Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1412 (9th Cir. 1996). ............. 18

*T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Asso.*, 809 F2d 626, 630–31 (9th Cir 1987). ........................................................................... 14, 15

*Washington v. Garrett*, 10 F.3d 1421, 1433 (9th Cir. 2002). ................................ 18

<u>Statutes</u>

42 USC §12102(1). ............................................................................................... 16

42 USC §12102(2)(A); ......................................................................................... 16

42 USC §12102(4). ............................................................................................... 16

42 USC §12102(4)(A). .......................................................................................... 16

42 USC §12102(1)(C). .......................................................................................... 17

<u>Other Authorities</u>

29 CFR §1630.2(i). ............................................................................................... 16

29 CFR §1630.2(h). .............................................................................................. 16

29 CFR §1630.2(j). ............................................................................................... 16

29 CFR §1630.2(l). ............................................................................................... 17

Fed. R. Civ. P. 56 .................................................................................................. 14

## I. INTRODUCTION

Plaintiff Regina McDonald worked for Defendant Linda Vista Care Center for 14 years. She was terminated from her longstanding employment just 3 days after reporting that she was injured on the job. She suffered 3 broken ribs and damage to her elbow and told her superiors that she required medical attention because of the pain she felt from this on the job injury. On the day before plaintiff was scheduled to go in to see her doctor, she was presented with a termination letter and for the first time was told that she was making medication errors severe enough to justify her termination. As demonstrated below, plaintiff has sufficient evidence to establish both a *prima facie* case of discrimination and to establish that there are issues of material fact that must be decided by a trier of fact. This summary judgment request must fail.

## II. CONCESSIONS

Plaintiff voluntarily dismisses her second, third, and fourth claim for relief. Plaintiff in no way wants to waste the courts time or focus, so we will instead focus on our other two claims.

## III. FACTS RELEVANT TO THIS SUMMARY JUDGMENT MOTION

### A.    Background Information

Plaintiff Regina McDonald was hired as a Charge Nurse by Defendant on July 27, 1998 and worked their continuously in that capacity until March 1, 2012. During her nearly 14 years of employment, Ms. McDonald was written up once for absenteeism and has never received a formal written warning or write-up for any medication errors. Harris Dep. 89:1-22; McDonald Dep. 206:8-16. All of her supervisors have characterized Ms. McDonald as a great nurse, who is very focused on the care of her patients, and has even been characterized by Laurie Harris, her immediate supervisor, as "her rock." Atterberry Dep. 36:6-13, 112:9-15; Clemence Dep. 7:15-21; Harris Dep. 43:14-18, 94-95:21-11.

In the years leading up to plaintiff's termination, she had taken time off for various on the job injuries she had suffered. McDonald Dep. 66-71. In February 2011, plaintiff injured her knee and she was placed on light-duty restrictions that continued till her termination on March 1, 2012. McDonald Dep. 48-50. Her mobility was limited and she was forced to be off of her feet more often. Id. Defendant accommodated her by having other employees push her heavy medication cart. McDonald Dep. 48:8-11; Harris Dep. 60-61.

      **B.**      **Fall That Lead to Termination**

On February 27, 2012, close to the end of her shift, Ms. McDonald fell while treating a patient and suffered three broken ribs and a pinched nerve in her left elbow. Complaint ¶ 12; McDonald Dep. 94:1-3, 97:17-21, 178:17-21. After her fall, Ms. McDonald reported the incident to Cheryl Atterberry, the Director of Nurses, and told her that she had hurt her left side and her left elbow. McDonald Dep. 92:10-14. Ms. Atturbury was shown the injured elbow and at the time Ms. McDonald thought the elbow was broken. McDonald Dep. 92:10-14, 97:11-13. She reported to Ms. Atterberry that she was have a lot of pain, she was having trouble breathing, and that she though the damage could be bad. McDonald Dep. 205:12-17.

Ms. McDonald finished out the short remaining time in her shift on February 27, but was limited to sitting in front of a computer. McDonald Dep. 98:6-9. Ms. McDonald made an appointment with her general practitioner for Friday, March 2, 2012, the first available appointment time. McDonald Dep. 92:16-19. Ms. McDonald had February 28 & 29 off and spent almost the entirety of these two days in bed. McDonald Dep. 95:6-9. She came back to work on March 1, 2012 and told Ms. Atturbury that she had made an appointment with her doctor the following day and that she was still in a lot of pain from her fall 3 days prior. McDonald Dep. 92:19-22, 99-100:16-5. She also told Ms. Atterberry that it was taking her a

5   - RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
**LEE FERGUSON, P.C.**
1204 W. Main St, Medford, OR 97501
(541) 772-6462 / Fax: 1-541-306-4516
Email: law.wilson12@gmail.com

long time to do her job because of the pain she was in. McDonald Dep. 99:19-20.

She worked her shift on March 1, 2012, but was only able to stand and move long enough to administer medicines. McDonald Dep. 98:6-9. Otherwise, she was sitting at her desk due to the pain that she was in. Id. And unlike most days, on March 1, 2012, she had to have other nurses or aides bring the patients to her for their medications. McDonald Dep. 98-99:19-12. She was only able to go to a few patient's rooms, those who were too sick to be moved, to administer their medicines. Id.

### C. Investigation of Plaintiff's Nursing Practices

Laurie Harris, plaintiff's immediate supervisor, testified that received complaints from other nurses that plaintiff was committing Medication errors beginning February 15, 2012. Harris Dep. 221:16-21. She also testifies that she began investigating plaintiff's medication errors three or four days prior to plaintiff's termination on March 1, 2012. Harris Dep. 139-140:22-4. Despite discovering these errors a few weeks earlier and reporting it to her supervisor, Cheryl Atterberry, the Director of Nurses, she did not begin to investigate the errors until around the same time that plaintiff reported her February 27, 2012 injury. Harris Dep. 221:6-21. Furthermore, the decision to terminate plaintiff wasn't made until a day or two prior to plaintiff's termination on March 1, 2012. Atterberry Dep. 124:9-12. This means that the investigation and the decision to terminate plaintiff all could have occurred subsequent to plaintiff reporting her injury to defendant.

The circumstances surrounding the people investigating plaintiff are also relevant to plaintiff's position. Ms. Harris states that she was alerted to plaintiff's medication errors by another charge nurse, Elizabeth Feckler. Ms. Feckler and plaintiff had a hostile relationship prior to her termination and her complaints should have been viewed as a further escalation of

6    - RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**LEE FERGUSON, P.C.**
1204 W. Main St, Medford, OR 97501
(541) 772-6462 / Fax: 1-541-306-4516
Email: law.wilson12@gmail.com

their relationship. Atterberry Dep. 113:18-23; Harris Dep. 54:2-4. Laurie Harris, plaintiff's supervisor, was put in charge of the investigation of medical errors. Atterberry Dep. 58:15-22. Both Cheryl Atterberry and Brenda Thornton have testified that their decision to terminate plaintiff was based on the documents Laurie Harris produced in her investigation. Atterberry Dep. 123:7-8. Laurie Harris and plaintiff also have a negative relationship and defendant should have had every reason to look more deeply into the documented medication errors if this were the real reason for plaintiff's termination. Atterberry Dep. 86:13-15; McDonald Dep 160; Harris Dep. 150:9-10.

Between mid-February 2012 until Ms. McDonald's termination on March 1, 2012, she was never informed about any of these medication errors. McDonald Dep. 206:8-16. Defendant alleges that these medication errors had been going on for over a year, yet plaintiff was never written up for actions or reprimanded. McDonald Dep. 206:8-16; Atterberry 133:19-22. It was not until her termination on March 1, 2012 that she ever knew she was making these types of mistakes. McDonald Dep. 102-103:25-4. As will be argued in detail below, all of these medication errors could have easily been avoided by simply informing plaintiff of the problem and giving her an opportunity to correct her behavior. Id. If these medication errors were the real reason for her termination, there would be some documentation of corrective action taken to change her behavior over the previous year.

**1.    Failure to administer scheduled medications to residents and failure to properly account for medication**.

It is important to note, that at no point has defendant or anyone else accused plaintiff of stealing any of these omitted medications. There is no evidence that the medication counts, once corrected by plaintiff, were ever incorrect.

Defendant claims these errors to be the primary reason plaintiff was terminated. Defendants MSJ, page 5. According to defendant, each of these "medication errors" actually constitute two separate errors: 1) plaintiff was pre-signing out medications before checking on patients to ensure that they were able to take the medications and 2) plaintiff was omitting medication doses to the patients. Harris Dep. 201:3-10. The former allegation being a "documentation error" and the latter being the more serious "medication error." Harris Dep. 202:3-9. Since this is "primary reason" plaintiff was terminated, should the court find that there is an issue of material fact relating to this factor, that alone should be enough to show pretext and this claim should survive summary judgment.

       i.      **Documentation Errors**

As defendant states, the proper protocol to administer medications is to first assess that the patient is able to take their medications, then return to the medication cart to sign out and administer the medications. Defendants MSJ, page 6. This practice of pre-signing out medications was common practice at Linda Vista. Laurie Harris testified that she knew of many other nurses who would do this same thing. Harris Dep. 201-202:15-9. These employees were "educated" about their errors and told to correct their actions, they were not immediately terminated. Id.

In addition, defendant recently provided plaintiff's counsel with all of the drug reconciliation sheets from 2011 until plaintiff was terminated. Defendant claims that these were the records they used to investigate plaintiff's "medication errors." Given the large number of these documents, plaintiff has only been able to review approximately 25 percent of the drug reconciliation sheets that were turned over. Amongst these documents, plaintiff has discovered 16 instances of other charge nurses committing these same types of "documentation errors,"

8   - RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**LEE FERGUSON, P.C.**
1204 W. Main St, Medford, OR 97501
(541) 772-6462 / Fax: 1-541-306-4516
Email: law.wilson12@gmail.com

many of which are repeat errors by the same nurses. See attached Exhibit 2. Even on the documents that defendant relies on to show medication errors, there are three examples of other nurses committing these exact same errors. Exhibit 3, Prestige (LV) 000580, 000598, 000613. To plaintiff's knowledge none of these nurses were terminated for these errors. Had this infraction truly been the cause of plaintiff's termination, a larger investigation of the nursing staff as a whole should have been performed. Otherwise, plaintiff should have been "educated" about what she was doing wrong and given the opportunity to correct her actions, as was defendant's standard practice.

### ii.     Medication Errors

Defendant claims that the larger issue is that plaintiff was omitting dosages to patients. Defendants MSJ, page 6. All parties who have been deposed have admitted that there are times when a nurse will be unable to give a patient a medication. McDonald Dep. 112:1-7; Harris Dep. 123:8-11, 129:3-18; Atterberry Dep. 131. Plaintiff has stated that in every instance where defendant claims she omitted doses to her patients, that the patient was either asleep, had chocked that day, or they were so combative that nobody could give them anything. McDonald Dep. 112:1-7. Plaintiff testifies that according to standard nurse practices, a scheduled narcotic needs to be given at or near the time it is scheduled. McDonald Dep. 129:2-13. Her standard practice was to come back and check on patients who had missed scheduled medications within a half hour of her visit to reevaluate their condition. McDonald Dep. 127:18-21. In every instance that defendant claims she omitted a dose, the patient was still unable to take their scheduled medication. McDonald Dep. 130:18-22.

Defendant claims that there were patient who were complaining of increased pain after plaintiff's shifts and that patients should only be omitted dosages very rarely. Harris Dep. 140:5-

9   - RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
**LEE FERGUSON, P.C.**
1204 W. Main St, Medford, OR 97501
(541) 772-6462 / Fax: 1-541-306-4516
Email: law.wilson12@gmail.com

9, 130:4-10. A careful review of the narcotics logs shows that patients were being omitted dosages of their scheduled medications all of the time. Again, only having gone through approximately 25 percent of the narcotics sheets provided by defendant, plaintiff has found over 50 examples of narcotics not being given at their scheduled time. See Exhibit 4 for a small sample of these narcotics sheets. For example, on Exhibit 4, Prestige (LV) 000812, this patient did not receive her scheduled evening narcotic on January 30, 2012. The only difference between plaintiff's actions and this evening nurse's actions is that by pre-signing out medications, plaintiff makes it easier to find when she was unable to give the patient her medication. On several occasions, nurses were pre-signing out medications, correcting the count afterwards, and the patient would go without medications at that scheduled time, exactly the behavior plaintiff is accused of. See Exhibit 5 for several examples of these practices.

     The records are riddled with examples of patients not receiving their medications, which lends credence to plaintiff's claims that in every instance cited by defendant, the patient was unable to take their scheduled medication. In addition, all of plaintiff's supervisors who have been deposed have characterized her as a very care oriented nurse who cares a lot for her patients. Atterberry Dep. 36:6-13, 112:9-15; Clemence Dep. 7:15-21; Harris Dep. 43:14-18, 94-95:21-11. Why would they still characterize plaintiff this way if they felt she was harming patients by omitting medications to them? The facts that other nurses were committing similar medication errors to the extent that they were, is more evidence that the true reason for plaintiff's termination was not these medication errors.

//

//

//

**2.    Improperly Altering Medication Records**.

On defendant's Ex. 2 Prestige (LV) 000565, plaintiff testified that when she and the evening shift nurse where going through the medications at the end of her shift to make sure that all of the medications were there, they mistakenly thought that they were off by 7.5 ml of Hydrocodine. McDonald Dep. 139:5-13. Before they finished making corrections, they realized that they in fact were not missing and of the medication, so they attempted to change the count back to before they made any changes. McDonald Dep. 144:21-24. By this point the two nurses were did not know what to do so they brought this narcotics sheet to the Director of Nurses, Cheryl Atterberry. McDonald Dep. 145:13017.

A cursory glance at the narcotics sheets also shows many instances where entries are changed without second signatures. See Exhibit 6 for a few examples of this. The facts surrounding this relatively small documentation error should have been cause for a warning or "educations" session, and any trier of fact could easily find this relatively small mistake to be pretext for the real reason for her termination.

**3.    Failure to timely and properly note doctor-prescribed medication changes**

Once again, this is an example of a relatively small mistake that is just pretext for the real reason for her termination. Plaintiff testified that she received this physician's telephone order near the end of her shift. McDonald Dep. 149:4-13. According to standard practice, a nurse who receives a telephone order should fill out a TO form and then notate the order on the patient's MAR sheet. Harris Dep. 95-97. By the time plaintiff wrote out the TO form, the evening shift nurse had already taken over the medication cart, which is where the MAR sheets were located. McDonald Dep. 151:1-16 Plaintiff testified that she told the evening shift nurse that the MAR sheet needed to be updated and then left. McDonald Dep. 150:4-9. She had the next two days

11 - RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**LEE FERGUSON, P.C.**
1204 W. Main St, Medford, OR 97501
(541) 772-6462 / Fax: 1-541-306-4516
Email: law.wilson12@gmail.com

off. McDonald 15:12. When she returned to work on February 24, 2012 she noticed that the medication had not been noted on the MAR sheet until February 24. McDonald Dep. 150:14-17. This means that the extent of plaintiffs error was writing "noted" on the TO form when she gave it to the evening shift nurse to put onto the MAR sheet.

If this were a terminable offense, as defendant claims, then both plaintiff and the night shift nurse should have lost their jobs. As it is, only plaintiff was accused of wrongdoing. Just another example of how the stated reasons for termination are a pretext for discrimination. It is important to note that the patient was still receiving ibuprofen, albeit not liquid ibuprofen as was ordered. This means that little damage was done to the patient as result of this error.

**4.    Discontinuing medication without a doctor's order.**

Plaintiff disagrees with every factual assertion defendant makes in this claimed "error." Plaintiff testifies that she could not get ahold of the medication, Florastor, to give to her patient. McDonald Dep. 155-157. Roberta Clemence, in charge of central supply and responsible for keeping Florastor stocked, corroborates plaintiff's version of events. Linda Vista Care Center used to use a drug called Acidophilus before they switched to Florastor. Clemence Dep. 19:11-16. Ms. Clemence testified that Florastor could be very hard to find and at times they would run out of the medication. Clemence Dep. 20-25. Since this was an over the counter medication and not vital to the patient's safety, it was unlikely that they would have emergency ordered it overnight. Clemence Dep. 25:10-21.

Plaintiff testified that on February 15, 2012 she was unable to find Florastor. McDonald Dep. 155-157. She called Ms. Clemence who said they did not have any. Id. She contacted Ms. Stewart to ask her what to do. Ms Stewart said to discontinue the order. Id. Plaintiff asked if the patient should go onto Acidophilus and Ms. Stewart told her not to. Id.

In addition, when asked, none of plaintiff's supervisors could provide a single reason why a nurse would unilaterally take a client off of Florastor, except reasons that would be sadistic in their nature. Atterberry Dep. 141:5-7; Harris 233-234:22-17. Florastor is a GI that is used in patients taking antibiotics to prevent C-diff. Atterberry Dep. 141. C-diff can cause bloody diarrhea that is very hard to get rid of. Id. No nurse would unilaterally discontinue an order of Florastor for a patient if it would result in the patient getting sick, especially not one who is continually characterized as a patient care oriented nurse.

The testimony of Plaintiff and her supervisors differs so drastically, that only a trier of fact after hearing the testimony of all parties and Barbara Stewart herself would be able to determine whether any error was made.

**5.    Changing medication administration times, contrary to doctor's orders.**

This is another case of directly conflicting testimony. Plaintiff testified that she was told directly by physicians to change the scheduled medication times and that she never did this for her own convenience. McDonald Dep. 158-159:17-17. Plaintiff's supervisors were unable to point to any of these altered MAR sheets and the packet of "medication errors" provided to plaintiff a few month after her termination did not include any proof of these allegations. Harris Dep. 136:7-11; Atterberry Dep. 146-147:23-2. This lack of proof suggests this "medication error" is pretextual, but also provides a material fact that needs to be decided by a fact finder.

**6.    Adversarial relationship with other staff**

The most obvious reason that this cause for termination is pretext is that plaintiff worked for defendant for 14 years and always had the same bruff attitude. Atterberry Dep. 148:10-18. Her problems with Laurie Harris began in 2010 when Ms. Harris was hired and continued throughout the next two plus years. Harris 152:3-13. The only incident of plaintiff being

reprimanded for her attitude towards Ms. Harris was almost a year prior to her termination. McDonald Dep. 160:3-6.  Defendant points to issues Ms. McDonald had with Physical Therapy staff, but this was similarly going on for many months before defendant was terminated and plaintiff was never formally reprimanded for her actions.  Atterberry Dep. 153:20-25. Defendant's point to no incident or escalation in plaintiff's personality that would lead one to believe that this was the reason for her termination.

### D.     One final issue with defendant's factual assertions

On defendant's MSJ, page 14, that claim that plaintiff admitted to having done "something bad enough" to warrant termination.  This is a gross misstatement of the facts. Plaintiff has never admitted to committing any act that would have been a terminable offense.

## IV. LEGAL ANALYSIS

### A.     Summary Judgment Standards

Summary judgment is only warranted when there is no issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The burden of proof lies with the moving party and the evidence must be viewed most favorably towards the non-moving party.  *Celotex Corp v. Catrett*, Inc., 477 US 317, 322-23 (1986).  The Ninth Circuit has expressed that a judge "should neither engage in credibility determinations nor weigh the evidence presented by opposing parties and that all evidence and justifiable inferences must be viewed in the light most favorable to the nonmoving party . . ."  *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Asso.*, 809 F2d 626, 630–31 (9th Cir 1987).

The court has set out that the burden of proof only shifts to the non-moving party where the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact.  *Id*. at 322.  If a moving party fails to carry its initial burden of

establishing the absence of any genuine issue of material fact, the nonmoving party is not required to produce any opposing evidence, even if the nonmoving party would have the ultimate burden of persuasion at trial. *Adickes v. S.H. Kress & Co.*, 398 US 144, 160–61 (1970); *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F2d 563, 574 (9th Cir 1990).

At the summary judgment stage, a plaintiff's burden "is not high." *Pottenger v. Potlatch Corp.*, 329 F3d 740, 746 (9th Cir 2003). To withstand a motion for summary judgment, the Ninth Circuit has ruled that the nonmoving party must: (1) "[M]ake a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof" at trial; (2) Show that "there is an issue that may reasonably be resolved in favor of either party," and that the issue should therefore be resolved by the finder of fact; and (3) "[C]ome forward with more persuasive evidence than would otherwise be necessary when the factual context makes the nonmoving party's claim implausible." *British Motor Car Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund*, 882 F2d 371, 374 (9th Cir 1989); *Leisek v. Brightwood Corp.*, 278 F3d 895, 898 (9th Cir 2002) ("If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." (quoting *Celotex*, 477 US at 323–24 (1986))).

While plaintiff cannot rely on a "scintilla" of evidence, as defendant states, plaintiff merely needs to produce some significant probative evidence tending to support its claim. *T.W. Electrical Service, Inc.* 809 F2d at 630.

**B.    Disability discrimination claim under the ADA**

In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show that she 1) is disabled or perceived as such; 2) is a qualified individual, meaning he is capable of performing the essential functions of the job; and 3) suffered an adverse employment

**LEE FERGUSON, P.C.**
1204 W. Main St, Medford, OR 97501
(541) 772-6462 / Fax: 1-541-306-4516
Email: law.wilson12@gmail.com

action because of her disability. *Nunes v. Wal–Mart Stores, Inc*., 164 F.3d 1243, 1246 (9th Cir.1999).  Plaintiff has shown substantial issues of material fact that establish all three elements of this claim and thus defendant's motion for summary judgment should be dismissed.

      **1.**      **Plaintiff was actually disabled or perceived as such**

A person can have an ADA-recognized disability in one of three ways: the person (1) has a "physical or mental impairment that substantially limits one or more major life activities," (2) has a record of the impairment, or (3) is regarded as having such an impairment. 42 USC §12102(1).  Under the ADAAA, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 USC §12102(2)(A); 29 CFR §1630.2(h).  the Equal Employment Opportunity Commission (EEOC) supplemented the ADAAA list by including as additional major life activities interacting with others, and sitting and reaching. 29 CFR §1630.2(i).

The ADAAA sets out that the definition of "disability" is to be liberally construed and that it is not meant to create a demanding standard for qualifying as disabled.  42 USC §12102(4). "The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 USC §12102(4)(A).  In addition, the ADAAA sets out that the term "substantially limits" one or more major life activity is not meant to be a significant burden for plaintiffs.  The 2011 EEOC rules state that "an impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered a major life activity." 29 CFR §1630.2(j).

Evidence that plaintiff suffered a "substantial impairment" is readily available.  Plaintiff

suffered a substantial injury on February 27, 2012 which caused her immense pain and discomfort in her everyday activities.  She was limited in her ability to breath, lift heavy objects, or stand and walk for more than a limited amount of time.  She was bed ridden for several days after the injury and limited in her ability to do her job.  Over the next year, plaintiff was diagnosed and treated for three broken ribs and a pinched nerve in her elbow.  She required surgery on her elbow and still suffers pain and discomfort from her fall, albeit less than the months immediately following her fall.  At the very least, there is a issue of material fact regarding the severity of the injury and how much the injury limited her daily activities.  These facts are well documented through depositions, the attached affidavit of plaintiff, and the medical record.

      A person can also have a disability recognized by the ADA if he or she is "regarded as having such an impairment," that is, a physical or mental impairment that substantially limits one or more major life activities.  42 USC §12102(1)(C).  A person may be protected under this part in three circumstances: (1) The person has an impairment that is not substantially limiting but is treated as having such an impairment; (2) The person has an impairment that is substantially limiting only because of the attitudes of others toward it; and (3) The person may simply be perceived as having a substantially limiting impairment, even though he or she has no impairment at all.  29 CFR §1630.2(l). See 29 CFR §1630.2(l) (Appendix).

      After her fall on February 27, 2012, plaintiff reported the incident to Cheryl Atterberry, the Director of Nurses, and told her that she had hurt her left side and her left elbow.  McDonald Dep. 92:10-14.  Ms. Atturbury was shown the injured elbow and at the time Ms. McDonald thought the elbow was broken.  McDonald Dep. 92:10-14, 97:11-13.  She reported to Ms. Atterberry that she was having a lot of pain, she was having trouble breathing, and that she

17  - RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

though the damage could be bad. McDonald Dep. 205:12-17. Brenda Thornton was also notified of the injury and seemed upset that plaintiff was injured. McDonald Affidavit, page 2.

On March 1, 2012, prior to her termination, plaintiff reported back to Cheryl Atterberry informing her that she had made an appointment with her doctor because she feared her injuries were worse then she first expected. McDonald Affidavit, page 2-3. Throughout the day on March 1, 2012, plaintiff was limited to very non-demanding work, but with some effort and a lot of pain was able to finish her day. Defendant had substantial knowledge of plaintiff's injuries and should have considered her to be substantially limited in her daily activities.

Plaintiff has provided substantial probative evidence that show that the determination of plaintiff's disability could be decided for either party. There are many issues of material fact that need to be decided by a trier of fact under this claim.

**2.      Defendant's non-discriminatory reasons for termination are pretext for discrimination.**

Defendant's last argument on page 18 of the Motion for Summary Judgment sets out that plaintiff is not a qualified individual because defendant had non-discimnatory purposes for her termination. Defendant cites *Schnidrig*, which sets out, "[W]hen evidence to refute defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimal prima facie case." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1412 (9th Cir. 1996). Defendant further cites *Washington v. Garrett*, which sets out that plaintiff must raise a genuine issue as to whether the employer's explanation for its action is true. *Washington v. Garrett*, 10 F.3d 1421, 1433 (9th Cir. 2002).

Plaintiff has laid out in great detail above why she believes defendant's non-discriminatory reasons to be pretextual. *Supra* 6-14. Many genuine issues of material fact have

18  - RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

been established that require a trier of fact to determine the issue of pretext. Plaintiff's claims along with the timing analysis laid out on page 3 above go beyond mere assertions that defendant was wrong in their decision to fire, it lays out very real facts that allow for the inference of discriminatory motive. Every error defendant points out is greatly over shadowed by the opportunity and motive on the part of defendant to terminate for discriminatory reasons.

### C. Intentional Infliction of Emotional Distress

To establish a claim of intentional infliction of emotional distress, the plaintiff must allege facts showing that: (1) The "defendant intended to inflict severe mental or emotional distress" or that the distress was certain or substantially certain to result from the defendant's conduct; (2)The defendant's acts "in fact cause[d] the plaintiff severe mental or emotional distress"; and (3) The defendant's acts consisted of "'some extraordinary transgression of the bounds of socially tolerable conduct'" or exceeded "'any reasonable limit of social toleration.'" *Patton v. J.C. Penney Co., Inc*., 301 Or 117, 122 (1986) (quoting *Hall v. May Dept. Stores Co*., 292 Or 131, 135 (1981)). Should the court find that plaintiff failed to meet her burden to allege necessary facts, the court should grant plaintiff leave to amend her complain to comply with these requirements.

The court "may consider the existence of a special relationship, including an employer and employee relationship, between the parties in determining the bounds of socially tolerable conduct." *Harris v. Pameco Corp*., 170 Or App 164, 172 (2000). Therefore, the employer-employee relationship is a significant factor to be considered in determining whether the conduct exceeds any reasonable limit of socially tolerable conduct. *MacCrone v. Edwards Center, Inc*., 160 Or App 91, 100 (1999). In this case plaintiff has alleged that defendant fired her 3 days after she sustained a significant injury on the job. Complaint ¶ 11, 12. Plaintiff was in vulnerable

19  - RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

state, was injured, and needed to rely on her employer to support herself during her recovery. Instead plaintiff was provided with a list of bogus reasons for her termination and then let go. Plaintiff alleges more than just merely she was wrongfully fired. When coupled with her injury and her need for support during her recovery, a trier of fact could easily find that defendant's actions constitute an "extraordinary transgression of the bounds of socially tolerable conduct."

## V. CONCLUSION

The court should dismiss defendants motion for summary judgment in lieu of the plethora of issues of material fact that need to be determined by a jury.